# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION


ANTHONY LYONS
        Plaintiff,

vs.                                 CASE NO: 2:08-cv-614-JES-SPC

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.
_____


## <u>REPORT AND RECOMMENDATION[1]</u>

_____This matter comes before the Court on the Plaintiff, Anthony Lyons, Complaint Seeking

Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the

Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on August 4, 2008. The Plaintiff filed his

Memorandum of Law in Support of the Complaint (Doc. #19) on December 29, 2008. The

Commissioner filed a Memorandum of Law in Support of the Commissioner's Decision (Doc. #24)

on January 28, 2009. Thus, the Motion is now ripe for review.

      The Undersigned has reviewed the record, including a transcript of the proceedings before

the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings

and memoranda submitted by the parties in this case.

_____

---

[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

# **FACTS**

## *Procedural History*

The Plaintiff filed an application for disability insurance benefits on September 3, 1998. (Tr. 15). The Plaintiff's claim was denied initially on March 31, 1999, and no further appeal was sought on these applications. (Tr. 15). The Plaintiff's filed a second application for disability insurance benefits and supplemental security income was filed on September 24, 1999. (Tr. 15). Those claims were denied initially on January 31, 2000, and upon reconsideration on March 28, 2000. (Tr. 15). The Plaintiff did not seek further appeal on these claims.

On September 28, 2000, the Plaintiff protectively filed a third set of applications for disability insurance benefits and supplemental security income. (Tr. 15). The Plaintiff alleged an onset disability date of December 31, 1997. (Tr. 15). The Plaintiff's claims were denied initially on April 11, 2001, and upon reconsideration on January 11, 2002. (Tr. 15). The Plaintiff filed a timely request for hearing on February 5, 2002. (Tr. 15). A hearing was held before the Honorable H. Allen Wegner, Administrative Law Judge (ALJ), on November 1, 2002 in West Palm Beach, Florida. (Tr. 15). The Plaintiff appeared in person with his Counsel, Anthony Reeves. (Tr. 15). The ALJ issued an unfavorable decision on June 24, 2003, finding the Plaintiff not disabled and capable of performing his past relevant work as a groundskeeper and electrician's helper. (Tr. 15). It was determined the Plaintiff maintained the residual functional capacity (RFC) for unskilled, routine work at all levels of exertion, with the exception of working at unprotected elevations or near dangerous moving machinery. (Tr. 15). The Plaintiff filed a timely request for review with the Appeals Council. (Tr. 15). While the claim was under review by the Appeals Council, the Plaintiff filed subsequent applications for disability insurance benefits and supplemental security income on

July 2, 2003. (Tr. 15). The Plaintiff's claim for disability insurance benefits was denied on July 29, 2003, for lack of insured status as of the alleged onset date. (Tr. 15). However, on May 13, 2004, the Appeals Council granted the Plaintiff's Request for Review, vacated the June 24, 2003, unfavorable decision and remanded the matter for further consideration of various issues. (Tr. 15). The Appeals Council issued instructions for consideration.[2]

Further instruction was also given to associate the subsequent claims with the remanded claims. (Tr. 16). Soon thereafter, the matter was transferred from the Fort Lauderdale, FL, hearing office to the Tampa, FL hearing office. (Tr. 16). The case was re-assigned to the Honorable Dawn B. Lieb, ALJ. (Tr. 16). A neuropsychological consultative examination was obtained. (Tr. 16). A hearing was held on June 26, 2007, in Fort Myers, Florida. (Tr. 16). A supplemental hearing was held on August 29, 2007, in Fort Myers, Florida.. (Tr. 16). The Plaintiff was represented by Counsel during both hearings. (Tr. 16).

### *Plaintiff's History*

The Plaintiff was born on August 26, 1961, and was thirty-six (36) years old on the alleged onset disability date, which is defined as a person of younger age. (20 CFR 404.1563 and 416.963).

---

[2]Enter and identify all relevant evidence and documents into the records and include them on the List of Exhibits; Obtain all treatment and examination records for the relevant period, including clarification of the validity of the results of the mental status examination from Anne M. Wells, Ph.D, as well as this source's opinions; Obtain a consultative neuropsychological examination with complete psychological testing and a medical source statement about what the Plaintiff still can do despite his impairments; Obtain the Plaintiff's school records, including any mental status reports; Obtain evidence from a medical expert regarding the nature and severity of the Plaintiff's impairments, including an opinion on whether the impairments meet or equal the severity of a Listings impairments; Further evaluate the Plaintiff's subjective complaints, including the third-party statement in Exhibit 1E, in accordance with Social Security regulations and rulings; Give further consideration the Plaintiff's maximum residual functional capacity and, in so doing evaluate the opinions of record, all in accordance with Social Security regulations and rulings, and, Obtain supplemental evidence from a vocational expert. (Tr. 16).

The Plaintiff has a high school education and is able to communicate in English. (Tr. 26). The Plaintiff has a past relevant work history as a yardman and a day laborer. (Tr. 139, 496). The Plaintiff alleges an onset disability date of December 31, 1997, due to borderline intellectual functioning and epilepsy. (Pl. Brief, Doc. #19, p.3).

### Medical and Psychological History

_____From June 10, 1999 through May 16, 2001, the Plaintiff was treated at Epilepsy Services of Southwest Florida ("Southwest") for seizures. (Tr. 184-196). On July 19, 2000, the Plaintiff complained of nocturnal events and night time jerking. (Tr. 195). Southwest indicated that Plaintiff had seizure disorder since childhood. (Tr. 195). The Plaintiff reported having nocturnal seizures several times a month. (Tr. 195). The Plaintiff stated that when he had seizures he felt nervous and shaky, that he fell backwards, and became unconscious. (Tr. 195). The Plaintiff was taking anti-seizure medication, including Dilantin, Depakote and Phenobarbital. (Tr. 194).

On February 7, 2001, the Plaintiff presented to Lee Seizure Disorder Clinic with complaints of bleeding gums and lethargy. (Tr. 188). On May 16, 2001, Southwest noted that the Plaintiff had the following side effects from the medications: lethargy, un-coordination, and tremors. (Tr. 188). The side effects of these medications included tremors, poor coordination, drowsiness, jerking and bleeding gums. (Tr, 185-186). The Plaintiff also reported nocturnal seizures three (3) times per week with his last seizure taking place on May 15,2001. (Tr. 186). Southwest noted the etiology as being birth trauma. (Tr. 186).

On September 10, 2000, the Plaintiff was treated at Hendry General Hospital for dizziness and seizures. (Tr. 202). Dizziness was due to drug toxicity resulting in a decrease in Dilantin use. (Tr. 202-207).

4

On September 12, 2001, the Plaintiff was examined by Manuel L. Soto, M.D., F.A.C.S., American Board of Surgery. (Tr. 218-220). The Plaintiff stated that he suffered from uncontrolled grand mal seizures and was under the care of Dr. Collins, a neurologist who attends the Epilepsy Foundation. (Tr. 218). The Plaintiff stated that the neurologist recommended no heat exposure, loud music, driving or stress to avoid seizures. (Tr. 218). Dr. Soto noted that historically, the Plaintiff had three (3) seizures a month. (Tr. 218). The Plaintiff complained of pain in his right arm and of having a poor grip on the right hand. (Tr. 218). Dr. Soto noted that the Plaintiff had surgery on his right hand anteriorly. (Tr. 220). Dr. Soto diagnosed the Plaintiff with grand mal seizure disorder, by history. (Tr. 220). Dr. Soto noted that his opinion was that the Plaintiff needed more frequent visits to his physician to modify his treatment to accomplish full control. (Tr. 220). Dr. Soto noted that the Plaintiff should be able to do work-related activities with limitations that are given for those with epilepsy. (Tr. 220-B).

From January 27, 1996, through June 9, 2006, the Plaintiff was treated at Hendry/Glades Seizure Disorder Clinic ("Hendry"). (Tr. 230-244, 361-388). On September 12, 2001, June 14, 2002, and December 13, 2002, Randolf Geslani, M.D., noted that Plaintiff suffered from nocturnal seizures due to myoclonic epilepsy. (Tr. 231). Dr. Geslani prescribed Depakote. (Tr. 230-231,234).

On June 11, 2004, Dr. Robert Perkins noted that Plaintiff was "jerking" three times a week, mostly nocturnally. (Tr. 379). On December 17, 2002, Plaintiff was examined by Anne M. Wells, Ph.D., a licensed psychologist, for a Psychological Evaluation relating to his application for disability benefits. (Tr. 251-258). The Plaintiff reported that he had problems with hearing, speaking, stuttering, reading, spelling, writing, arithmetic, motor skills, behavior, attention, and hyperactivity. (Tr. 251). The Plaintiffs school records indicated that he earned C's, D's, and F's from

6th through 12th grade, was placed rather than promoted into 9th grade, and repeated 10th grade. (Tr. 252). Dr. Wells noted that the Plaintiff had a modified high school curriculum and was enrolled in Basic Math and English-I General in 12th grade; his final grade point average was a 1.327. (Tr. 252). Dr. Wells noted that the Plaintiff reported he had not worked since 1991 because of his seizure disorder. (Tr. 252). Dr. Wells administered the "Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) and Plaintiff scored a Verbal IQ of 66, Performance IQ of 70 and Full Scale IQ of 65. (Tr. 254). Dr. Wells noted that IQ scores may vary due to attention, motivation, random chance, and other reasons, and for that reason he also gave a 95% confidence level that Plaintiffs Verbal IQ was in the 62-72 range, his Performance IQ was in the 65-79 range, and his Full Scale IQ was in the 62-70 range. (Tr. 254). Dr. Wells administered the Wide Range Achievement Test - Third Edition (WRATv 3) and the Plaintiff scored a Reading Standard Score of 76, a Grade Score of 4th, and had a Descriptor of Mildly Impaired. (Tr. 255). Dr. Wells opined that Plaintiff's performance IQ score was probably most consistent with his abilities. (Tr. 256). Dr. Wells diagnosed Plaintiff with depressive disorder, not otherwise specified, impulse-control disorder, not otherwise specified, borderline intellectual functioning, seizure disorder, and frequent headaches. (Tr. 256). Dr. Wells stated that epilepsy could result in deficits in attention, processing speed, manual dexterity, memory, language and executive functions. (Tr.256-257). Dr. Wells also reported that individuals with intellectual skills in the borderline range might have difficulty with adaptive-living skills, which might have a negative impact on social, emotional and vocational functioning. (Tr, 257). Dr. Wells opined that based upon the Plaintiff's seizure disorder and the negative side effects of his anti-seizure medications, the prospect of Plaintiff working seemed "unrealistic". (Tr. 257).

On May 1, 2004, Robert R. Perkins, M.A., Case Manager at Epilepsy Services, wrote a letter

to ALJ Wagner. Dr. Perkins ordered tests or blood work in order to determine compliance upon complaints of toxicity. (Tr. 259). The Plaintiff had experienced an increase in myoclonic seizures after being seen at the Hendry Seizure Disorder Clinic in December 2002. (Tr. 259). The Plaintiff needed to increase one of his anti-epileptic drugs to better control the seizures. (Tr. 259).

On March 17, 2005, the Plaintiff was received by the South Florida Reception Center for the Florida Department of Corrections where an initial examination was completed for transfer to Calhoun Correctional Facility. (Tr. 316-319). The Plaintiff's EKG was sinus tachycardic, but otherwise normal. (Tr. 316). There were no other significant findings or abnormalities. (Tr. 318). The Plaintiff was diagnosed with Seizure Disorder, Abnormal SMAC, PPD 20 MM, Asymptomatic Male. (Tr. 318).

On March 20, 2007, the Plaintiff was examined by Lane R. Carlin, M.D., of the Florida Neurology Group. (Tr. 392-394). Dr. Carlin noted that the Plaintiff's epilepsy began in childhood and the Plaintiff feels anxious and shaky. (Tr. 392). The Plaintiff tired easily, had blind spots, blurred vision, double vision, saw flashing lights and wavy lines; lost part of his field of vision, bleeding gums, shortness of breath, constipation, had been nauseated, and had increased frequency of urination. (Tr. 393). Dr. Carlin diagnosed the Plaintiff with epilepsy, unclassified. (Tr. 394). Dr. Carlin noted that the Plaintiff had obvious work restrictions such as driving a truck, working at heights, and with heavy machinery. (Tr. 394).

On March 22, 2005, the Plaintiff had a Health Appraisal at the Florida Department of Corrections and it indicated that the Plaintiff suffered from diabetes and seizures. (Tr. 322). On May 4, 2005, the Plaintiff was examined at the Florida Department of Corrections. It was noted that the Plaintiff was not approved for work camp. (Tr. 292).

On April 12, 2007, the Plaintiff was examined by Bruce Borkosky, Psy.D., Licensed Psychologist. (Tr. 402-404). Dr. Borkosky diagnosed the Plaintiff with Adjustment Disorder, Pain disorder, Rule-out Specific-Learning Disorder, Personality Disorder N.D.S., Rule-out Borderline Intellectual Functioning. (Tr. 404).

On May 24, 2007, the Plaintiff was examined by Dr. Borkosky for a Psychological Evaluation. (Tr. 399-401). Dr. Borkosky administered the WAIS-III which the Plaintiff returned a Verbal IQ score of 54, a Performance IQ score of 58, and a Full Scale IQ score of 52. (Tr. 400). Dr. Borkosky diagnosed the Plaintiff with adjustment disorder, pain disorder, rule out specific learning disorder, rule out malingering, personality disorder, and rule out borderline intellectual functioning. (Tr. 401).

The Plaintiffs school records reveal an IQ score of 71 in 1975. (Tr.181).

<u>*Administrative Law Judge's Decision*</u>

Upon consideration of the record, the Plaintiff met the insured status requirements of the Social Security Act through September 30, 1999. (Tr. 18). The ALJ found the Plaintiff has not engaged in substantial gainful activity since December 31, 1997, the alleged onset date (20 CFR 404.1520(b), 404.1571, *et seq*., 416.920(b), and 416.971 *et seq*. (Tr. 18). The ALJ further determined the Plaintiff suffered from the following severe impairments: seizure disorder; an affective disorder variously diagnosed as depressive disorder or adjustment disorder; borderline intellectual functioning; and, personality disorder (20 CFR 404.1520©) and 416.920©)). (Tr. 19). However, the Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. (Tr. 21). Therefore, upon

careful consideration of the entire record, the undersigned finds that the Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels, but with non-exertional limitations that include limitations for no driving of trucks, working with heavy machinery, or working at heights. (Tr. 24). The Plaintiff is also limited to simple, repetitive tasks with one -two step instructions. (Tr. 24). The ALJ found the Plaintiff is unable to perform any past relevant work. (Tr. 25). The ALJ noted the Plaintiff was born on August 26, 1961 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged onset disability date. (Tr. 26). The Plaintiff has a high school education and is able to speak English. (Tr. 26). The ALJ found transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the Plaintiff is "not disabled," whether or not the Plaintiff has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). (Tr. 26). Having considered the Plaintiff age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Plaintiff is capable of performing. (Tr. 26). Therefore, the Plaintiff was found to have not been under a disability, as defined in the Social Security Act from December 31, 1997, through the date of the ALJ's decision. (Tr. 27)

## THE STANDARD OF REVIEW

### A. Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, and whether the findings are supported by substantial evidence. Hibbard v. Commissioner, WL 4365647 *2 (M.D. Fla. December 12, 2007) (citing Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971); McRoberts v. Bowen, 841 F. 2d 1077, 1080

(11th Cir. 1988)). In evaluating whether a claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations[3]. 20 C.F.R. §§ 404.1520(a), 404.920(a). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Hibbard, WL 4365647 *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v. Barnhart, 357 F. 3d 1232, 1240 n. 8 (11th Cir. 2004). The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must

---

[3]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability. The steps are as follows:

*Step 1.* Is the claimant engaged in substantial gainful activity? If the claimant is engaged in such activity, then he or she is not disabled. If not, then the ALJ must move on to the next question.

*Step 2.* Does the claimant suffer from a severe impairment? If not, then the claimant is not disabled. If there is a severe impairment, the ALJ moves on to step three.

*Step 3.* Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled. If not, the next question must be resolved.

*Step 4.* Can the claimant perform his or her former work? If the claimant can perform his or her past relevant work, he or she is not disabled. If not, the ALJ must answer the last question.

*Step 5.* Can he or she engage in other work of the sort found in the national economy? If so, then the claimant is not disabled. If the claimant cannot engage in other work, then he or she is disabled. See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]." Phillips, 357 F. 3d at 1240 n. 8; Dyer v. Barnhart, 357 F. 3d 1206, 1210 (11th Cir. 2005). If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

## B.  Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Williams v. Commissioner, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005) (citing Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994)); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Thomas v. Barnhart, WL 3366150 *3 (11th Cir. December 7, 2004) (citing Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993)). The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Johnson v. Barnhart, 268 F. Supp. 2d 1317, 1321 (M.D. Fla. 2002) (citing Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996)).

"To remand under sentence four, the district court must either find that the Commissioner's

decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim." Johnson, 268 F. Supp. 2d at 1321; Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards). "Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision." Johnson, 268 F. Supp. 2d at 1321 (citing Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain the his basis of his decision)).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Johnson, 268 F. Supp. 2d at 1321; See Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)(finding the Court may at any time order additional evidence to be taken before the Secretary upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding); See Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. Jackson, 99 F.3d at1095; Johnson, 268 F. Supp. 2d at 1321.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). "To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level." Green v Commissioner, 2007 WL 4287528 * 3 (M.D. Fla. Dec. 4, 2007) (citing Jackson, 99 F.3d at 1090 - 1092; See also Keeton v. Dept. of Health and Human Serv., 21 F.3d 1064, 1068 (11th Cir. 1994)). With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[4] Id.

**C. Standard of Review for Evidence Evaluated by the Appeals Council**

Congress left the term "final decision" undefined in 42 U.S.C. § 405 (g). Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review, the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405 (g). Sims v. Apfel, 530 U.S. 103, 106-107, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000). The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not

---

[4]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. Jackson, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. Id. In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. Id.

supported by substantial evidence. 20 C.F.R. § 416.1470; <u>Sims</u>, 530 U.S. at 111; <u>Parker v. Bowen</u>, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc). The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. <u>Sims</u>, 530 U.S. at 111.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's review is similarly broad. <u>Id.</u> at 111-112. When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review. 20 C.F.R. § § 404.970 (b); 416.1470 (b); <u>Keeton</u>, 21 F.3d at 1066. Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence if that evidence was available at the time of or prior to the ALJ's hearing and then denies review. <u>Williams v. Commissioner</u>, 407 F. Supp. 2d 1297, 1302 (M.D. Fla. 2005) (citing <u>Keeton</u>, 21 F.3d at 1066). Similarly, it is reversible error for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council. <u>Id.</u> The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision. <u>Falge v. Apfel</u>, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998). When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence. <u>Id.</u> at 1323. The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review. <u>Falge</u>, 150 F.3d at 1324; <u>Keeton</u>, 21 F.3d at 1066; <i>See</i> <u>Williams v. Commissioner</u>, 407 F. Supp 2d 1297, 1302 (M.D. Fla. 2005) (concluding that <u>Keeton</u> and <u>Falge</u> are consistent and that a claimant may always challenge the decision of the Appeals Council to deny review). Indeed, it makes sense that Congress has provided for judicial

review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies. When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error. Ingram v. Commissioner, 496 F. 3d 1253, 1264-1266 (11th Cir. 2007). Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error. 20 C.F.R. § 404.970 (b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record); Ingram, 496 F. 3d at 1264-1266; Falge,150 F.3d at 1324; Keeton, 21 F.3d at 1068. The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

## THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists

in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## **DISCUSSION**

### *Whether the ALJ Properly Assessed Whether Plaintiff's Impairments Met Listing 12.05C*

The Plaintiff argues the ALJ erred by not finding the Plaintiff's mental impairment met the criteria for Listing 12.05C. The Defendant argues the ALJ's decision is supported by the medical record and the Plaintiff failed to meet the threshold requirement of Listing 12.05C.

Listing 12.05C provides:

Mental retardation: Mental retardation refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

C. A valid, verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Part 404, Subpart P, Appendix 1

In order to meet the requirements of Listing 12.05C, the Plaintiff must show (1) that he has an IQ between 60 and 70 and (2) a physical or other mental impairment imposing an additional and significant work-related limitation of function.

### *1. Whether the Plaintiff's IQ was Between 60 and 70*

The ALJ found the Plaintiff failed to establish that he had a full scale IQ of 60 to 70. The ALJ noted that the Plaintiff completed high school and that his school records indicate that his high school IQ was listed as 71. (Tr. 20). The ALJ reviewed the results of Anne M. Wells, Ph.D. who met with the Plaintiff in December 2002. When tested, the Plaintiff received a verbal IQ score of

66, a performance IQ score of 70, and a full scale IQ score of 65. (Tr. 21). The Plaintiff admits in his brief that Dr. Wells also gave a 95% confidence level that Plaintiff's Verbal IQ was in the 62-72 range, his Performance IQ was in the 65-79 range, and his full Scale IQ was in the 62-70 range. (Doc. #19, p. 12). Dr. Wells stated that Plaintiff's performance IQ score was probably most consistent with his abilities. (Tr. 21).

The ALJ refuted Dr. Wells conclusions by pointing to the diagnosis of Dr. Jonas who, at the August 29, 2007 hearing, reiterated the fact that the validity of some of these IQ test scores are of some question given the other evidence of malingering. (Tr. 23). The ALJ found there was insufficient evidence to find significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period. (Tr. 23).

The ALJ further supported his conclusion by examining the Plaintiff's daily living skills and level of daily functioning, Dr. Wells reported that individuals with intellectual skills in the borderline range might have a difficulty with adaptive-living skills, which might have a negative impact on social, emotional, and vocational functioning. (Doc. #19, p. 13). However, the ALJ pointed out the Plaintiff admitted that he performed his own personal hygiene tasks, and stated that he could use a telephone and phone directory, as well as make purchases. (Tr. 21). This is further in agreement with the Plaintiff's own report where he indicated that his ability to cook, perform personal care tasks, clean, do laundry, shop and sleep were not effected by his condition. (Tr. 22). The Plaintiff's own testimony regarding his daily activities refutes Dr. Wells' conclusion. Furthermore, the ALJ pointed out that the Plaintiff had a high school diploma, he didn't attend any special education classes, he filled out his own social security forms, and he was able to earn money from 1983 - 1990 from $13,696.69 to $18,408.31 per year. (Tr. 23). Therefore, the ALJ properly

discredited Dr. Wells' opinion regarding the Plaintiff's functioning by noting the Plaintiff was able to effectively perform activities of daily living - cleaning, shopping, cooking, maintaining a residence, using telephones, etc. (Tr. 22).

Thus the ALJ's conclusion that the Plaintiff did not meet the IQ criteria of listing 12.05 was supported by substantial evidence in the record.

### 2. Whether the Plaintiff Had a Physical or Other Mental Impairment Imposing an Additional and Significant Work-Related Limitation of Function

The Plaintiff argues that he satisfied the second requirement of the listing by having several other physical and mental impairments imposing additional and significant work-related limitations of function. The Plaintiff argues he suffers from epilepsy and seizures, affective disorder, and a personality disorder. Plaintiff also points to Dr. Carlin's statement indicating he cannot drive a truck, work at heights, or with heavy machinery as evidence in and of itself which should satisfy the second prong of the analysis. (Doc. #19, p. 14).

In his decision, the ALJ noted the Plaintiff's disability report which indicated that he was unable to work due to a seizure disorder and difficulties standing, walking, and working around hot temperatures. (Tr. 25). He reported having seizure activity that occurred at least once a month, and said that when the seizures occurred his breathing stopped. (Tr. 25).

In regard to the Plaintiff's allegations of having seizures, the ALJ points out in his analysis that:

> In June 1999, Dr. Irra noted that the claimant had "complex partial seizures well controlled with Dilantin and Phenobarbital." (Exhibit 1F). On seven successive occasions in 1999 (May 12th, June 14th, July 20th, August 26th, September 27th, October 27th and December 2nd) the claimant either denied having any seizures, or failed to report that he had a seizure (Exhibit 7F). An EEG done in November 2000 returned "normal" (Exhibit 1F). Dr. Soto opined in September 2001 that the claimant "should be able to do work-related activities with limitations that are given

to those with epilepsy" (Exhibit 5F). Prison records through portions of 2004 and 2005 indicate that the claimant's seizures were stable (Exhibit 11F). Finally, in March 2007, Dr. Carlin again opined that the claimant's seizures were "infrequent" and that he was "clearly able to work," save for some of the requisite precautions appropriate for those with a history of seizure disorder (Exhibit 14F). Dr. Jonas also reviewed the evidence of record in its entirely and also noted a low frequency of seizure events, as well as the fact that there is little in the way of corroborative, third-party witness reports as to the frequency and nature of the claimant's alleged seizures. The claimant's seizure disorder clearly does not meet sections 11.02 or 11.03 of the Listings. (Tr. 22).

Moreover, the ALJ further noted that treating source Dr. Carlin again examined the Plaintiff in March of 2007 and noted his last seizure was one year ago... From a medical standpoint, [the claimant] is clearly able to work, and in fact, wishes to work.... (Tr. 19).

While the ALJ concluded at step three of the analysis that the Plaintiff suffered from a severe impairment - seizure disorder; the ALJ concluded at step 4 of the analysis that the seizure disorder was not severe enough to impose an additional and significant work-related limitation of function. The ALJ supported his conclusion with substantial evidence in the record. Therefore, the Plaintiff's argument that his seizures satisfied the second prong of 12.05C, lacks merit.

The Plaintiff also described having frequent headaches (Tr. 25). Similar testimony was offered at the August 29, 2007, hearing. The Plaintiff said he spent his days lying around. He indicated that his medications caused drowsiness, and said that when he has a headache he must lie down for two to three hours.

However, after considering the evidence of record, the ALJ found "that the Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (Tr. 25). The ALJ found that the Plaintiff's headaches were not credible since he never complained of them to his treating physicians. (Tr. 25). Regarding his

drowsiness from medications, he never reported having any side effects from his medications to his physicians. (Tr. 25). Moreover, the allegations were found to be less than credible since they are entirely subjective, and there are also suggestions of malingering. (Tr. 25).

Regarding his affective disorder and personality disorder, Dr. Juan Carlos Rodriguez, M.D., found in December of 1997, that the Plaintiff's personality and affect were appropriate, and his general behavior was normal, and memory, calculation, cognition, thinking, judgment, and executive function were all within normal limits. (Tr. 20). Mood and affect were noted to be dysphoric, though on the Beck Depression Scale-Second Edition (BDI-II), the Plaintiff's score was only in the mildly depressed range. (Tr. 21).

In regard to social functioning, the ALJ notes the Plaintiff has, at most, mild difficulties. (Tr. 22). The Plaintiff described himself as a loner. While there is a diagnosis of a personality disorder, Dr. Borkosky opined that there were moderate limitations in responding appropriately with supervisors and responding appropriately to changes in a routine work setting, and while a criminal history is noted, Dr. Jonas opined at the August 29, 2007, hearing that this was inconsistent with the rest of the evidence of record. The ALJ noted that upon each examination, the Plaintiff was reported to be calm, and cooperative. Dr. Jonas also surmised that the basis for Dr. Borkosky's opinion was also based on some flawed evidence, given Dr. Borkosky's own notes of potential malingering. (Tr. 22).

Therefore, the ALJ concluded that although the Plaintiff had some mild mental and social limitations, they did not rise to the level which would impose an additional and significant work-related limitation of function. It is respectfully recommended that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

Accordingly it is hereby

**RESPECTFULLY RECOMMENDED:**

The final decision of the Commissioner should be **AFFIRMED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED** at Fort Myers, Florida, this ___24th___ day of May, 2009.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  Counsel of record, MJCD